**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SALLYPORT GLOBAL SERVICES, LTD., | ) | |
| 3601 Eisenhower Avenue | ) | Case No. 14-cv-01927 |
| Alexandria, Virginia 22304 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | |
| ARKEL INTERNATIONAL, LLC, in its | ) | |
| own right and as successor by merger to | ) | |
| ARKEL INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | | |

Plaintiff, Sallyport Global Service, Ltd., ("Sallyport"), by its undersigned attorneys, hereby files this Complaint against defendant, Arkel International, LLC, in its own right and as successor by merger to Arkel International, Inc., and, in support thereof, avers as follows:

## Parties

1.     Sallyport is a company formed under the laws of Bermuda with an address at 3601 Eisenhower Blvd., Alexandria, VA, 22304.

2.     Arkel International, LLC is a limited liability company organized under the laws of the State of Louisiana with an office within the District of Columbia and an office at 1048 Florida Blvd., Baton Rouge, LA, 70802.  Arkel International, LLC is the successor by merger to Arkel International, Inc. (collectively "Arkel").  On information and belief, none of the members of Arkel are citizens of Bermuda.

## Jurisdiction and Venue

3.     This Court has original jurisdiction over the claims stated herein pursuant to 28 U.S.C. § 1332(a) because the parties are a citizen of a foreign state and a citizen of a state and because the amount in controversy is in excess of $75,000.00.

{J1893824.1}

4.     This Court is an appropriate venue because Arkel has maintained an office within the District and, as such, is subject to this Court's personal jurisdiction.

**Arkel's Breach of the Joint Venture Agreement for
Failure to Pay Monies "Due from Arkel to Sallyport"**

5.     Sallyport -- which means a secured, controlled entryway -- is in the business of providing mission critical security, housing and catering in hot spots across the world.

6.     Arkel is a contractor that undertakes construction projects around the world, particularly for governments and militaries.

7.     On February 26, 2008, Arkel and Sallyport entered into a Joint Venture Agreement ("Joint Venture Agreement")  (Ex. A) by which they formed a Joint Venture ("Joint Venture").

8.     The purpose of the Joint Venture was to pursue jointly business opportunities in South Sudan on an exclusive basis, selling and performing construction contracts and providing security and later operating a camp with sleeping and eating facilities.

9.     The parties agreed to an allocation of profits and losses, set forth in Article 4 of the Joint Venture Agreement as follows:

    (a)     construction activities – 80% to Arkel and 20% to Sallyport;

    (b)     catering and security – 80% to Sallyport and 20% to Arkel;

    (c)     base support activities – 50% to each; and

    (d)     any remaining activities – 50% to each.

10.     For purposes of accounting, each JV contract was first categorized as a) construction, b) security/catering, c) base operation or d) base support activities.  Thereafter, each cost arising from each contract was placed into that category.  Each cost followed the specific contract.

11.     For direct costs, labeled "Direct Costs" on the Joint Venture's Financial Statements, this task was simple as direct costs were readily attributable to a construction project or to a security/catering contract.

12.     The question at the outset of the Joint Venture for Sallyport and Arkel, however, was the method to address indirect costs, such as overhead (like camp operations), which cannot be readily attributable to a specific contract as those costs benefit all Joint Venture activities and both joint venturers.

13.     After numerous conversations and discussions between the parties, Arkel and Sallyport resolved the question by agreeing that indirect costs would be allocated to Arkel and Sallyport based on the same percentage of allocated direct costs.  Thus, if Arkel incurred 75% of the direct costs to its projects in a fiscal year and Sallyport incurred 25% of the direct costs to its projects, 75% of the indirect costs would be allocated to Arkel and 25% would be allocated to Sallyport.

14.     The basis underlying this agreement is not complex: it is fair and reasonable to conclude that the work activities of each party will require a level of indirect costs which is commensurate with its direct costs in order for those activities to be performed.

15.     The following table, taken from the Joint Venture's Financial Statements, summarizes and demonstrates the agreement of the parties:

| Fiscal Year | "Direct Costs" Arkel Construction – Sallyport Security/Catering | | Indirect Costs "Operating Expenses" Arkel – Sallyport | |
|---|---|---|---|---|
| 2/28/09 | 75% | 25% | 75% | 25% |
| 2/28/10 | 63% | 37% | 63% | 37% |
| 2/28/11 | 64% | 36% | 64% | 36% |
| 2/29/12 | 53% | 47% | 53% | 47% |
| 2/28/13 | 68% | 32% | 68% | 32% |
| 2/28/14 | 80% | 20% | 80% | 20% |
| 7/31/14 | 80% | 20% | 80% | 20% |

16.     This allocation of indirect costs was disclosed on the financial statements which were supplied quarterly to Arkel and on a regular basis to Arkel's outside accounting firm, Hannis T. Bourgeois, LLP of Baton Rouge, LA, for purpose of its audits of Arkel.  There was nothing hidden or undisclosed to Arkel about this discussed and agreed upon allocation of indirect costs.

17.     The front page of each annual financial statement contains a line labeled "Due from Arkel to Sallyport."  This line item depicts the accumulation of the annual borrowings from Sallyport's capital account to cover Arkel's proportionally greater share of the Joint Venture's losses due to Arkel's Joint Venture activities.  This line item evidences that Sallyport's capital account was being drawn down each year in order to subsidize Arkel's greater share of the Joint Venture's annual losses.

18.     The financial statements show the monies due from Arkel to Sallyport each year as follows:

| Fiscal Year | "Due from Arkel to Sallyport" |
|---|---|
| 2/28/09 | $    13,707.84 |
| 2/28/10 | $  108,358.93 |
| 2/28/11 | $  145,282.57 |
| 2/29/12 | $  214,234.64 |
| 2/28/13 | $  351,934.28 |
| 2/28/14 | $  446,261.20 |
| 7/31/14 | $  469,190.01 |

19.     This line item, "Due from Arkel to Sallyport," was plainly stated on the front page of each financial statement -- clear and unmistakable -- to both Arkel and to Sallyport.

20.     Notwithstanding the parties' prior agreement and seven years of financial statements which establish this agreed upon course of conduct, Arkel disputes that it owes these monies to Sallyport.

**Arkel's Breach of the Agreement for Refusal to Close on Sallyport's Acceptance of
Arkel's Offer to Purchase Sallyport's Interest in the Joint Venture**

21.     The parties also agreed, in Article 5.10 of the Joint Venture Agreement, to use a

"Texas Shootout" or put mechanism in the event of disputes which could not be resolved.  Under

this mechanism, one party could make an offer to buy out the other party or to sell its interests to

the other party.  The other party was then required to either accept the offer and sell its interests

or the other party could elect to buy out the offering party by paying to it the amount proposed

by the offering party.

22.     By letter dated June 16, 2014, Arkel exercised the put set forth in Article 5.10,

offering to sell to Sallyport, at a price of $198,944.05, Arkel's 50% interest in the Joint Venture.

(Ex. B)

23.     By letter dated July 14, 2014, Sallyport elected, as provided under Article 5.10,

not to buy Arkel's 50% interest but, instead, to sell Sallyport's 50% interest in the Joint Venture

to Arkel at the price set by Arkel of $198,944.05.  (Ex. C)

24.     The day after receipt of Sallyport's letter of acceptance, July 16, 2014, Arkel

wrote to Sallyport stating that Arkel would compensate Sallyport by delivery of a promissory

note in lieu of cash, as permitted by Article 5.10 of the Joint Venture Agreement, but also stated

that Arkel planned to send a representative to the South Sudan to take inventory of the camp and

analyze the value of the property.  (Ex. D)

25.     Thereafter on August 13, 2014, Arkel wrote to Sallyport that, notwithstanding that

it had earlier exercised the put and that Sallyport had accepted the put and agreed to a sale to

Arkel at Arkel's set price of $198,944.05, Arkel now would repudiate the agreement and purport

to exercise a new put:  Sallyport could sell its 50% interest in the Joint Venture to Arkel at a

price of $79,044.06 or Sallyport could buy Arkel's 50% interest at a price of $79,044.06.  (Ex. E)

26.     By letter dated August 20, 2014, Sallyport notified Arkel that its actions constituted a breach of the Joint Venture Agreement and Sallyport's agreement to accept the put and demanded that Arkel close on the purchase of Sallyport's share of the Joint Venture, as per the terms of the June 16, 2014 Arkel exercise of the put as accepted by Sallyport on July 14, 2014. (Ex. F)

27.     Arkel, however, has not responded to this request and remains in breach of the Joint Venture Agreement and the exercise and acceptance of the put.

**Arkel's Failure to Pay Sallyport's Invoices for
Food Services and Security Services Provided to Arkel**

28.     Pursuant to agreement of the parties, Sallyport provided to Arkel food services and security services to Arkel's facilities located in Iraq.

29.     Despite requests to do so, Arkel has failed and/or refused to pay to Sallyport some $181,533.00 due and owing for those services in breach of the parties' agreement and understanding.

**Arkel's Failure to Pay Sallyport's Invoices for
Commission on the LBG Prime Power Contract**

30.     Pursuant to agreement of the parties, Akel agreed to pay to Sallyport a commission on total contract revenue received by Arkel on the LBG PowerPro Contract in Iraq.

31.     Despite requests to do so, Arkel has failed and/or refused to pay to Sallyport some $123,460.91 due and owing in commissions  in breach of the parties' agreement and understanding.

## COUNT I
## Breach of Contract

32.     The averments of paragraphs 1 through 31 are incorporated as if set forth in full herein.

33.     Arkel's failure and/or refusal to pay Sallyport monies due and owing under the Joint Venture Agreement as indicated on the financial statements and in the amount of

$469,191.01 constitutes a breach of the Joint Venture Agreement which has proximately caused damages to Sallyport.

WHEREFORE, Sallyport demands judgment in its favor and against Arkel in an amount in excess of $75,000.00, as well as prejudgment interest, and such other and further relief as this Court deems just and proper.

## COUNT II
### Specific Performance/Breach of Contract

34.    The averments of Paragraphs 1 through 33 are incorporated as if set forth in full herein.

35.    Arkel's failure and/or refusal to close on the exercise of the put in light of Sallyport's acceptance of the put constitutes a breach of the Joint Venture Agreement and also a breach of the offer and acceptance of the put which has proximately caused damages to Sallyport in the amount of $198,944.05.

36.    Under the terms of the Joint Venture Agreement and the facts, Arkel should be ordered to specifically perform and to close on the sale of Sallyport's assets to Arkel and pay over to Sallyport the sum of $198,944.05, plus interest and any other damages caused by Arkel's breaches.

WHEREFORE, Sallyport demands judgment in its favor and against Arkel in an amount in excess of $75,000.00, as well as prejudgment interest, and such other and further relief as this Court deems just and proper, including ordering Arkel to specifically perform its obligations under Article 5.10 of the Joint Venture Agreement and close on the purchase of Sallyport's interests in the Joint Venture.

## COUNT III
**Breach of Contract**

37.     The averments of Paragraphs 1 through 36 are incorporated as if set forth in full herein.

38.     Arkel's failure and/or refusal pay monies due for food services and security services provided by Sallyport to Arkel's facilities in Iraq constitutes a breach of the parties' agreement which has proximately caused damages to Sallyport in the amount of $181,533.00.

WHEREFORE, Sallyport demands judgment in its favor and against Arkel in an amount in excess of $75,000.00, as well as prejudgment interest, and such other and further relief as this Court deems just and proper.

## COUNT IV
**Breach of Contract**

39.     The averments of Paragraphs 1 through 38 are incorporated as if set forth in full herein.

40.     Arkel's failure and/or refusal pay monies due and owing to Sallyport on the commission on total contract revenues received by Arkel on the LBG PowerPro Contract in Iraq has proximately caused damages to Sallyport in the amount of $123,460.91.

WHEREFORE, Sallyport demands judgment in its favor and against Arkel in an amount in excess of $75,000.00, as well as prejudgment interest, and such other and further relief as this Court deems just and proper.

Dated: November 17, 2014          Respectfully submitted,


_____/s/ Mark A. Johnston_____
Mark A. Johnston  (#455764)
Sarah Shyr (#1001227)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
1717 Pennsylvania Ave., NW, 12th Fl.
Washington, DC  20006-4604

(202) 659-6600 (telephone)
(202) 659-6699 (facsimile)
mjohnston@eckertseamans.com
sshyr@eckertseamans.com

and

Scott D. Cessar
Pa. I.D. No. 49639
*(Pro hac vice application to be filed)*

Audrey K. Kwak
Pa. I.D. No. 200527
*(Pro hac vice application to be filed)*

ECKERT SEAMANS CHERIN & MELLOTT, LLC
600 Grant St., 44th Fl.
Pittsburgh, PA  15219-2788
(412) 566-2581 (telephone)
(412) 566-6099 (facsimile)
scessar@eckertseamans.com
akwak@eckertseamans.com

*Attorneys for Plaintiff,*
*Sallyport Global Service, Ltd.,*
*a subsidiary of KS International*